Please be seated. Okay, we'll have Armendariz v. City of Colorado Springs 24-1201. And we'll hear from the appellant. Thank you. Good morning, and may it please the court. My name is Teresa Borden-Benz for plaintiffs Jacqueline Armendariz and the Chiric Center. I'd like to save three minutes for rebuttal. As this court recently reiterated in United States v. Santiago, the particularity clause prohibits the type of wide-reaching fishing expeditions that occurred here. Such searches are particularly egregious, whereas here they target First Amendment protected speech and association and are contained in electronic data. Unless this court acts, we face a future where individual protesters, advocacy groups, or really anyone exercising their First Amendment rights risk having their private electronic lives open to search by the government. The resulting chilling effect on protected speech and association cannot be overstated. The Constitution demands more, and this court should reverse. There are three warrants at issue here, and I'm going to focus on the second warrant, which is the second Armendariz warrant, which was the search of the devices that were seized by the first warrant. If you look at the, the government says, well, look at the affidavit, that shows you that we had probable cause to search for these particular things, and we would be able to find these things, and it did not exceed the scope of the warrant. But when you walk through that warrant, you see that it's not restricted to evidence of a crime. In fact, attachment B to the warrant number two says that it's searching for things relevant to the investigation, not relevant to the crime. What about the next sentence? The next sentence is part of the affidavit. The attachment B that sets forth what is to be searched by the search warrant itself does not contain that sentence. But the warrant incorporates the affidavit, correct? The warrant incorporates the affidavit, but here, by incorporating the affidavit, they actually made the situation worse, because when you walk through that affidavit, it's clear what's being targeted, and it's not evidence that goes to the attempted assault by bicycle drop. If you look at it, you see, you know, they start in the affidavit by saying, we have this footage of someone dropping this bicycle. We realize this person may be associated with Sean Walls. So therefore, we search her social media, we match up the bike, the helmet, all the things. They do the search warrant for those things and get them. But then in the second warrant, they proceed to talk about, in appendix 106, how protesters use phones, and they like to take credit for everything. That's the officer's speculation. There's nothing connecting Ms. Armendariz's crime, alleged crime, or anything that she's done that would suggest that she would take credit or she used her phone at the protest. What about the selfies that the affidavit refers to? He's referring to a selfie from a previous event. A previous protest. Was found on her public-facing Facebook profile that he used to verify her identity. And so then he infers that because there was a recent protest that she had attended, and that there was photographs, presumably, with some, either her using, giving somebody her cell phone or another cell phone, there were photographs, digital photographs, presumably, of her at this prior protest. And so the affidavit infers that, well, there's a fair probability that she had used her cell phone, that she had a cell phone when she was riding a bicycle, and that she was using that cell phone, presumably, to take photographs. Why isn't that at least a fair inference for probable cause to believe that there's going to be relevant digital data? It requires too much conjecture to make that leap. It's just a logical leap. And then again, so what? She takes selfies at protests. Does that, that's not a crime. So what the officer fails to do, and what the warrant fails to do, is connect the crime for which there's probable cause to search. When you say, when you say crime, what do you mean? The crime that Ms. Armendariz was accused of, and for which they were searching for evidence, was the attempted assault by bicycle drop. It was a spontaneous occurrence. Impeding an officer. And impeding an officer. But how about this, you see it throughout, illegal protest activity, and so forth. Is that a crime that we consider as part of this? No, that's the officer's characterization of all protests as being illegal. There can be illegal events that occur at protests, but not all protests are illegal. And again, if you walk through that affidavit, you see, you know, the speculation about how protesters use phone. And then there's the jump to Chinook is an anti-government and anarchist organization, according to the officer. And then they have six pages of Mr. Wall's beliefs. The connection of Ms. Armendariz to Mr. Walls, they happen to be Facebook friends. And so to make that connection, to say everything that Mr. Walls posted is imputed to Ms. Armendariz, and therefore we can search all of these things on her digital devices for all time. Because when you're looking at the keyword searches, the government says, well, we limited it. We limited it to 26 words. What do those 26 words have to do with? Mostly about the things that Mr. Walls posted about police protests or about other First Amendment protected views. They don't have anything to do. They can't uncover evidence that could possibly prove the crime they're investigating, which is the attempted assault by bicycle drop. Counsel, can I ask you a moment ago, you said the alleged crime. My understanding from the complaint and the briefs is that Ms. Armendariz entered a plea deal for obstructing the police officer for a deferred judgment and unsupervised probation for six months. First of all, did she challenge any of this evidence as part of the criminal process? My understanding is that there was no exclusionary proceedings with respect to this, but I don't know. It's not in the record. Okay. And then is the deferred judgment that she entered into, did that require her to either plead guilty or agree to facts that would be then later used to plead guilty had she had any violations? I'm not aware and it's not in the record because here we're pursuing a civil suit. Yeah, but we normally don't allow parties to come in on a civil suit to essentially try to invalidate a criminal conviction. And this is a point that just kind of glossed over in all these in the briefing on both sides. So I'm just trying to get a sense of what this deferred judgment, how that impacts, if at all, this civil suit. It doesn't impact it at all because we're not trying to invalidate Ms. Armandira's conviction. The conviction is the conviction. We're not trying to invalidate even the part of the Warrant 1 where they search for the bike, the helmet, the various things to identify her. The problem was the seizing of all of her devices simply because she was accused of a crime that occurred at a protest and the officers' speculation that protesters use phones and she seems to be on social media and she seems to have some social devices including hard drives, laptops from her work. Seize all of them and then with Warrant 2, perform these very intrusive searches. You're looking at one of the searches with two months of data. Yeah, but in the cases that you cite for the particularity requirement and your argument that the warrant was overly broad and even the manner of the searches executed, all those cases are criminal cases. Do you have any 1983 civil cases that go through this analysis and actually address the qualified immunity, which is what the district court found here, so that's what we're reviewing? One's not coming to mind. We may have cited one in our brief, but out of the key 10 circuit cases, you're right that many of them are dealing with the exclusionary rule, but the good faith analysis under the exclusionary rule is similar to the qualified immunity analysis here, so they still have the same effect and they still say very clearly that the scope of the search cannot exceed the probable cause on which it was based and that's the core problem with all of these warrants is that the probable cause was to pursue evidence of a attempted assault by bicycle drop and the scope of the warrant was much broader. It widened it into an unfocused probe on political views and associations. And so scope is really your point. You don't dispute that perhaps a search warrant could have been issued and executed for electronics if it were more confined as far as time or search term or something else. It's hard to say what our objections would be on a more confined search warrant, but that's not what we have here. We don't have a warrant that says we'd like her phone because we think she had it at the protest and we want to confirm that she was the person there in this location. That's not the search warrant we have. We have two months of data preceding the march and you know where they get that date? It's right there in the affidavit. They have a human rights march going to take place on July 31st. He posts that on June 5th. They say well we'll start searching Ms. Armenteras' devices for everything starting on June 5th and we'll go seven days past the protest in case she happened to take credit for it even though there's simply no evidence that she took credit for it, that anything would be found on these devices and these are very intrusive searches that should be, particularity should be viewed with the scrupulous exactitude and not this sort of, well people have phones, protesters like to use their phones for things, people have ideas on social media, therefore we get to search it all. Can I ask you, you're down to five minutes and I wish you both had an hour on this one, but you don't. Leon, everything you're saying about the search warrant and the scope and so forth, great, but a magistrate and neutral and detached magistrate approved this. It was run by the Steve Cliff. Well even the Messerschmitt case says the judge approval doesn't end the inquiry and we have Gros and then this the court's recent case in Santiago to say that when the officer drafted, basically drafted the search warrant because the warrant approved incorporated the affidavit as well as attachment B which sets forth the things to be searched and seized, you're going to give it less deference than you would if the magistrate had drafted the warrant him or herself and so here we have the officer drafting these overly broad affidavits and making the investigation about political ideas and speech that are totally untethered to the crime at issue and just because the judge approves it shouldn't excuse it and when you look at the Chinook warrant, you don't even have a crime in there. Which of the Leon Prongs you relying on that it was so void of probable cause that nobody should have issued it or that there were lies within the affidavit so therefore it's invalidated that way? Well what is your position there? That a reasonable officer should have known that it didn't conform with particularity which cases like Gros say is sufficient to get over. Is that enough that it's debatable that a reasonable one would say doesn't it have to just be black and white this thing is so devoid of probable cause? And we think that it is in this case because you look at the idea that an attempted assault that's a spontaneous crime that can't possibly have been planned unless Ms. Armendariz is a psychic. How could you be getting data from two months prior to that event? How can you be searching words that have nothing to do with it? If she hated the police. The only evidence of anti-police bias are Facebook posts from Mr. Walls. So is everything that your Facebook friends... I mean I'm not arguing with you. I mean you said how could her views be relevant to this particular crime unless she was a psychic? And so I think that would be their rejoinder well sure say the officer was black and she was a member of a very bigoted anti-black organization. Well the digital data may retrieve information that would be relevant to why she would throw her bicycle or drop her bicycle in front of an officer who was of a race that she detested. And so her views might be very relevant to whether or not she dropped the bicycle or she tried to obstruct an officer. And if she tried to obstruct an officer why? Why wouldn't that satisfy at least the very generous standard for probable cause? It wouldn't here because for one thing the officer says in the affidavit it's clear she intended to strike the officers. So there was no question and so they weren't investigating intent whatsoever. That's sort of a post hoc rationalization for asking for these things. So that wouldn't have been relevant at a trial? Not in there wasn't. If there were a trial I mean you're saying well they didn't need it. Well are you saying that there's a limit limitation on the fourth amendment you can't you can't you can get evidence only if you absolutely need it not if it's relevant. That's not the standard of course but it also isn't the standard that the police think there might be something there and it'd be nice to have it so they get it that's what the fourth amendment protections guard against. And so what they needed to do is show that there was a reasonable likelihood that there would be that type of anti-police evidence but what they base it on is Mr. Wall's statement. So if we're guilty of anything that people were friends with on Facebook post a lot of us would be in trouble. So you can't have that be the basis and that's the sole basis for this idea that we have to go after her political ideas and speeches because they might go to intent. And if intent is enough almost virtually every crime has some sort of mens rea. So it'd be really easy for an officer to say they've got phones they've got to prove intent there might be something on there I've got a you know search warrant let's go. Counselor can I ask you about the clearly established pong of qualified immunity. You mentioned Mr. Schmidt and it sort of lays out this test about the reasonably competent officer and a really narrow exception because the judge did approve this warrant. And as I read your brief you go through various criminal cases that talk about particularity and breadth. But it's a strained reading to say that this is you know doesn't have to be on all fours but do you have any cases or what's your best case unclearly established that gave these officers in Colorado Springs to be on notice that when they submitted that warrant affidavit that any reasonably competent officer should know even if the judge signs off on this that this warrant shouldn't issue? Well Crow from the Supreme Court says that no reasonable officer could believe that a warrant that didn't comply with particularity was valid. We also have the Foss case which has the first amendment concerns that we are present here and that was overbroad and the Supreme Court found that to be not reasonable. So we also cited Cassidy and Leary and Mora. Mora is another case. While it doesn't deal with electronics it really shows that you can't just say well I think alien smugglers do stuff in their house and they might have electronics there so that's good enough. You need more particularized facts because otherwise you're opening it up to the type of wide-ranging general search warrants the framers accord and for which they passed the fourth amendment. I see that my time is up. I'm going to give you time for rebuttal but I do have a question about this scrupulous exactitude point. Do you remember the case Neves versus Bartlett? Does Neves versus Bartlett apply if we reject your position on probable cause? If there's probable cause, as I recall, Neves versus Bartlett, I may be wrong, that the Supreme Court says well you don't have an independent claim for retaliation under the first amendment notwithstanding the fact that it may involve protected communications. If there's probable cause there's probable cause and so why wouldn't Neves versus Bartlett render your scrupulous exactitude point moot or irrelevant if there's probable cause? Because that's dealing with a retaliatory arrest and we don't have a retaliatory search. Why would it be different if that was talking about first amendment concerns and you're talking about first amendment concerns here? Because the first amendment concerns we have here are overlaid with the fourth claim for retaliatory search. We just have the overlay and in the Neves case and based on Stanford from the Supreme Court, with that overlay you've got to apply particularity at probable cause with that scrupulous exactitude. You have to be really careful because you're dealing with sensitive information for which there's a first amendment protection to have and so it's just saying particularly when you're going after this information and that's really what makes this case different than those dealing with drugs or child pornography or something where it's the contraband is the focus. Here it's the ideas. That's what the officers are searching for and they've said a lot of reasons why they need them but they've not proven up any of those reasons and connected them with the crime that's at issue in the Armendariz warrants and of course with the Chinook warrant no crime is at issue so there couldn't possibly be either particularity or probable cause to search those places. Thank you. Lisa, let's give her a minute for rebuttal. Thank you. May it please the court, Marissa Miller on behalf of the federal defendants. Today I'm sharing my argument time with Ann Turner who represents the Colorado Springs defendants. I will be addressing the Armendariz warrants, qualified immunity for Detective Summey and the claim for injunctive relief. Ms. Turner will address the remaining claims. I'm going to attempt to reserve seven minutes so that Ms. Turner also has time to answer your questions. The first thing I'd like to talk about today is the argument that the search terms in the second Armendariz warrant make the warrant unconstitutionally broad. There are three problems with this argument. The first is that these search terms do not define the scope of the search. Rather the warrant limits the scope of the search to evidence of a specific crime. What crime? The attempted assault that is referred to repeatedly throughout Detective Summey's affidavit. Meaning the bike throw, so-called throw. Yes, the alleged, sorry, the alleged attempted assault. And what exact, I'm confused what evidence the, you thought would come from this. Obviously she's not videoing. We have pictures of this drop throw that are included in the search warrant. She wasn't videoing it. She didn't, you wouldn't think that she would have planned this out. I'm going to take my bike and when I see an officer running to help with another person, I'm going to throw or drop my bike in front of this person. What possible evidence? Are you saying that maybe after the fact she would have said, aha, just like I planned. The officer came running up and I threw the bike, but unfortunately I threw it too soon so that he was able to run around it. Just I'm left vacant with what you were trying to seek, except for bad things about what they believe and her associations with questionable characters and stuff like that. But for the crime itself, impeding or assaulting or attempting to assault, I don't see where the search warrant is going to pick up anything help. Well, I think there was a range of evidence that search warrant was targeted to, obviously even excluding the physical evidence. But looking for photos and text messages, a photo would confirm that she was there and that she was the woman who was depicted in the body camera footage. Text messages, while obviously Ms. Armendariz's theory of the case is that this was a split second decision, the Colorado Springs Police Department thought that this might have been a planned incident. And as a result, they wanted to see if there was any discussions ahead of time about potentially inciting violence from the police at this protest. I also think that this kind of goes to the point of necessity is not a requirement for probable cause. The government is allowed to collect evidence that might seem superfluous at certain points because they don't know necessarily what they're going to need in trial. Yeah, but they also don't know what they're going to find here. I mean, you said, well, they may find photographs of it and they may find text messages. But what's interesting to me about the device's warrant is at this point, you have all the physical evidence. You've got the shoes, the helmet, you've got the bike that's been taken out of her car. The defendant herself has talked to the affiant by phone and had her office be in contact that she's been arrested. Like, all this has happened. And then the only link I can see that then the officer says to the judge to get a warrant is, well, we know that people do use electronic devices oftentimes to sort of document their thoughts. So theretofore, we get to search everything, even thumb drives, even hard drives, because maybe she she had a phone on herself that maybe she plugged that in somewhere. So how do we get from we have all these devices, we have all this physical evidence, and sure, we may not be limited in what's relevant evidence. But how do we get to the link that we're going to go through the thumb drives and the external hard drives? Where is that? So I think that that kind of comes from the higher level of generality that probable cause operates on or applying for these warrants, right? We're not applying to search specific containers or applying to search for specific things that we have identified. Those are these photos and text messages. And that means that when police show up at a property, they don't know what electronic devices they're going to find. They don't know what's the work computer. They don't know what's the burner phone. So they have to seize all of those devices before a search can be conducted. I think that the nexus that you're looking for comes not just from this boilerplate assertion that people have phones and they use them a lot, but from the very case and defendant-specific facts that we have in this case that simply won't be present in other cases. We have a defendant who is a prolific creator of social media content and frequently uses platforms like Facebook and Twitter to document and promote and communicate with other people about the exact kind of event where the attempted assault occurred. We know that she likely had her phone with her and was taking photos of the event. And we know that she had an online connection with and friendship with Mr. Walls, who isn't just some random person. He was not just present for the incident, but also the original target of the police officer's efforts. And so I think that gives rise to a fair inference that the two of them were going to communicate after the fact about what had happened. And to the extent that the government needed evidence of Ms. Armendariz's mental state, those text messages would have been critical. Why wouldn't it be overbroad on the keyword search terms relating to anti-police bias like the word pig? Why was there a fair probability that the police would find relevant evidence by searching for the word pig? Certainly, your honor. So I think the response to that is that we have to remember that the keyword search is not defining the scope of the search. It's an additional limitation that was imposed on how officers could search for evidence of the specific offense, right? The keyword search is actually saying not just you can look at everything that has these keywords, but you can't look at anything that doesn't have these keywords. It's something that operated very clearly to Ms. Armendariz's benefit because it's actually reducing unnecessary intrusions into her privacy. And I think to kind of drive that point home, it really helps to remember what the alternative is in this scenario, right? Because this court does not require search protocols. So if the warrant had simply said the officers are authorized to look for evidence of this assault, what would have happened would have been a manual search where the police officer goes application by application and file by file and is this relevant? No. Is this relevant? Yes. And that would have been significantly more intrusive than the search that happened here with the keywords. And that's why I think this court has been very hesitant to limit those restrictions ex ante and rather has more properly addressed those claims on the back end with a challenge to the reasonableness of how the search was actually conducted. What about the unlimited time period with the search terms? I think that, again, the unlimited time period reflects the limitation of the initial search, right? Which is that they're saying, okay, we're going to look through your phone for photos and text, but we're only going to do it for this two-month period. And then we don't want to exclude ourselves from everything else. So we're going to really cabin that in there. I thought, looking at attachment B, it says the search terms would be relevant regardless of any time period which they occurred. That's true. So they kind of remove those guardrails, right? They remove the guardrails, but then they add the search terms as additional guardrails that aren't present in original search. So the original time period is the guardrails on all the other devices, but the search term limitation itself is a separate guardrail. Yes. And then once we go outside that time frame. I do also think qualified immunity is extraordinarily important here. This court has never held that a warrant requires search terms that are carefully tailored to the crime at issue. And that's significant because it means that the court has never invalidated a warrant on the basis that Ms. Armendariz is asking you to do so today. So even I think if the court has concerns about those search terms, there is simply no case on the books that would have put Detective Summey on notice that the search terms that he chose were too broad. I think we also have to consider Messerschmitt, which tells us it's situations in which it's appropriate to impose personal liability on an officer are going to be extraordinarily rare. And when we consider the fact that the magistrate judge signed off on this and then a district court who was presented with briefing and had time to carefully consider the issue concluded these warrants were valid, it's extraordinarily problematic to say that it should have been obvious to Detective Summey who does not have a law degree that these warrants were problematic. I see that I am down to six minutes. Lisa, let's stop the clock. Are you through? I mean, I'm happy to address anything the court wants to talk about. Does Leon matter at all in this context? Leon is relevant in that it tells us when the Messerschmitt general rule doesn't apply. I do think the argument that the lack of probable cause in these warrants was so obvious that no reasonable officer could have thought they were valid is not an exception here. But I do think that the case law about the good faith exception is relevant. I do think the court can borrow from some of that. I think there's some interesting language and I think the Otero case where the court says, we understand that the officer was trying to draft a valid warrant and we understand why a reasonably competent officer would have thought they succeeded, but they didn't. So we're going to apply good faith. Is there a case, this case strikes me as out on the margin, which is to say that you have a video from a drone. You have these photographs that are included in the affidavit that show what they show, that the bike was either tipped or as the officer swears was thrown. And the officer running to the melee evades it with not a lot of difficulty, it looks like. He has room to do that. In other words, if you're trying to trip and you'd wait and throw the bike two seconds later, to the extent that there is a crime of attempted assault, it's already manifest, isn't it? It's not like a drug case. I wonder if this person has any cronies or let's catch them with X amount of drugs in their house and go search. The crime's already solved. Now we're just looking for anything we can find. And I don't know a case that's like that. Is there one? Well, I think my question, which I'm not directing back to the court, would be, is there a case that says that once the government has enough evidence to establish the conviction, it should stop? Because we never know what's going to happen at trial. Let's say someone comes into the police office and says, I murdered my wife. I'm going to write out my confession and here's the murder weapon. Case closed, right? But no, of course the police have the ability to rely on the very strong probable cause that this man murdered his wife to go search his house for the clothing that he was wearing. Does law enforcement need the clothing that he was wearing? We don't know. We don't know what's going to happen at trial and the government is under the fourth amendment. As long as it gets to the threshold of probable cause and as long as it shows nexus, it is allowed to collect that evidence. That might be fine, the clothing, but now we're off on every device, every thumb drive. That's a different ball game. I don't disagree, Your Honor. I think, however, we have to remember that there are some, the execution of a search warrant in a home is also extraordinarily invasive. The home is a sacred place that is very private. And what the fourth amendment, at least what this court's case law, what the Supreme Court has said is that those invasions of privacy are justified. That's how we balance the fourth amendment and the need to enforce criminal law with first amendment rights is by requiring the government to satisfy probable cause nexus particularity. Well, the word that keeps coming to mind for me is proportionality. I mean, you have one incident, an isolated incident, which by the way, we know when the civil complaint is filed, she got a deferred judgment of unsupervised probation, which my understanding is it's not even a criminal conviction. So it wasn't ultimately taken that seriously by the state. But yet with that allegation or that the nature of that investigation here, it seems to be extremely disproportionate where the government went to sort of search for evidence. Take your point, Your Honor. It is certainly an interesting idea that I think the gravitas of the offense might influence how extensive the government's search can be. Ms. Armendariz did cite some cases to that effect. None of them involve a situation here. I think the closest is a Supreme Court one about performing surgery to get a bullet out. But to the extent that the doctrine will develop in that direction, A, it hasn't in the circuit. There's no case that I'm aware of where the court has performed that analysis. But even if it does, those other cases suggest that once again, that's not something that goes to the validity of the warrant. That's actually something that goes to the reasonableness of the search. So we're not actually saying this warrant was problematic, but could she come back and say this search was unreasonable under the Fourth Amendment because this crime was minor? Very possibly. Okay. We'll hear from your colleague. Good morning. I'm Ann Turner on behalf of the city defendants. I want to get straight to the Facebook warrant, which hasn't been discussed by the petitioners, but I want to close up some loops that maybe will be left in Your Honor's hands. Specifically the probable cause supporting its issuance and specifically the nexus element. The issuing judge had a substantial basis for concluding that there was a fair probability that evidence of the crimes under investigation would be found in the Chinook Facebook page. And those being what? Those crimes were obstructing passage and resisting arrest. Okay. What about all this talk about illegal protests in the affidavit? Might that have misled the magistrate judge into thinking that's one of the crimes? Well, what the warrant says is arrests were made for obstructing passage and resisting arrest. Illegal demonstration is, to be frank, the terminology that the police use to describe a demonstration where essentially all of the participants engage in the illegal conduct, as was the case here. Approximately, the warrant describes how a group of 60 persons, which was essentially all of the protesters, engaged in walking down the middle of the street, blocking traffic despite repeated commands to move to the sidewalk. The photos don't show that, that are included in the search warrant from the drone. The Facebook warrant did not include any photos. Okay, but our collection, you're representing this as a fact, that you have 60 people and it's a melee. Traffic has been stopped. Well, the Chinook Facebook warrant says, the affidavit that Officer Steckler wrote, it's at A118 in the appendix, a group, quote, a group of approximately 60 protesters illegally marching northbound up South Tejon Street, blocking vehicle traffic in the process. And he continues and says, Lieutenant Chacon gave numerous verbal warnings to the group to inform them it was illegal to march in the roadway. So this was conduct, illegal conduct, that essentially all of the participants were engaging in. And that, so the crimes, obstructing passage and resisting arrest, plaintiffs contend that the warrant affidavit fails to identify the crimes under investigation, but that rests on a hyper-technical reading of the warrant, not the common sense, flexible and practical construction that this court applies. I guess I'm not sure yet. What are the crimes that- Obstructing passage. Oh, that's one of them. Yes. Obstructing passage and resisting arrest. In fact, the district court expressly found in the order at page 24 and 26 that Officer Steckler was investigating the crimes, the arrests for obstructing passage and resisting arrest. And that is proof positive that the judge had a substantial basis for concluding similarly. Now to the nexus, the nexus between- I hate to interrupt you. Lisa, is that clock moving? No. Oh, I just meant for your colleague. Sorry. Thank you. I'll move it along. That was my fault, by the way. Sorry. The nexus element, the nexus between the crimes under investigation, the obstructing passage and resisting arrest, and the Chinook Facebook page, that is demonstrated in three ways. First, the Facebook warrant recites that two individuals, Mr. Walls and Mr. Crutcher, had each posted to their personal Facebook accounts about the march. It's not unreasonable to conclude that they may also have posted to the Chinook Facebook account, which marketed and promoted and advertised the event through the Chinook Facebook account on the events page. And in fact, that's the nexus that the district court relied upon in the district court's order. But there's another reasonable inference to be drawn from the information in the warrant that creates this nexus. And that is that the illegal conduct of obstructing passage appeared coordinated. The warrant describes how essentially all 60 protesters engaged in the illegal conduct of obstructing passage. That coordinated conduct suggests that it was planned, suggests that it was discussed and perhaps even directed in advance. And if there were any place where any such communications or directions or pre-planning or taking credit were to exist, it would be in the Chinook Facebook account where the event was organized and planned. Counselor, can I go back a minute? You said the crime under investigation was obstructing passage and resisting. Yes. This warrant application was submitted, I think, August 3rd, so three days, give or take, after the protest. Okay. At that point, if I recall the facts, Mr. Wells or Walls was arrested along with maybe one other person? Right. Yes. Okay. So. If not, there might be, I think there might have been three or four in total. So were they investigating those crimes that they were going to charge from those arrests or were they investigating potential crimes against anyone else who may have been out there protesting? Well, I mean, it doesn't say that, so we're just sort of speculating. We're working on inference here. Yes. And so I think what you, what you, a reasonable inference from the warrant is they had arrested Mr. Walls and they had 60 other people who had also engaged in obstructing passage, but some had not been, many had not been identified. And so. But they were, this is what I'm trying to figure out though. Okay. So the warrant affidavit sets out the scene from, you know, the protest and it says there are 60 people walking down the street, were arresting Mr. Walls. But the other 59 people are right there and the police have formed a line. And so it just, the inference is they observed this activity. So if that were true, then why didn't they make more arrests? And that's to me relevant to Nexus because you're saying, well, this was a planned coordinated event. So we need this Facebook profile all behind the Facebook profile to try to figure out what exactly, when all these offenses would have been readily observable. I think that, I think it, so obstructing passage does have an intent element. And so if they find communications to that effect of an intent to engage in it, that that's the type of evidence. Okay. But by who? Because the warrant affidavit says Mr. Walls is posted on Facebook. I think it's Mr. Crutcher. It doesn't say that those two individuals are any way linked to the Chinook Center Facebook page, does it? Nor does it say the other 59 people who were there may have ever even observed, been a part of, posted the Facebook page. So what I'm getting at when it comes to Nexus, I'm looking only at what's the Nexus to this Facebook profile, Chinook Center, that through the SCA was harvested by this warrant to the other people or even to those individuals specifically? It was the Chinook Facebook page that announced this event as even occurring. And so that, the fact that the genesis of the event is the Chinook Facebook page. That is where people go to find out, where do I, where do I, how do I, how do I participate? Where do I go? Where are we meeting? What time? And then if there is instruction or direction in there, hey, everybody, we're going to march down the street. And even if the, if the police say, get on the sidewalk, defy them, that goes to intent, intent of every single person who participated in that illegal conduct. And, and so people chiming in. I mean, and so then the third Nexus point that I was getting to was that officer Steckler testified in the, in the affidavit that it was his professional, in his professional experience, people who participate in illegal demonstrations use social media to organize. And that's exactly what we're talking about here. The organization, the coordination, the plan to engage in this illegal conduct of obstructing passage. And then if they are arrested to resist, you know, if, if that's part of the plan and the direction, those, those types of communications, to the extent they exist, are likely to exist in the Chinook Facebook page. You know, if all that's true, the, the affiant here, I think it's Steckler that says he goes to the Chinook Center Facebook page and he sees a posting, there's going to be a protest, here's the rally point. What else were they thinking they were going to find? And why did he say that to the judge issuing the warrant? I think, so what he says is, and if you look at attachment B, the places he wanted to search were the posts, the chats. He does cite the events page because that's where it is, but things that he cannot see on a, on, because he's, you know, maybe he's not friended. But does he say that? Maybe I missed that. On attachment B? I see, I see on attachment B, he's saying, well, we want to look at all messenger chats, all posts, all events, all subscriber information. Got it. For one week. But you're saying, yeah, but you're saying that, well, what he really wanted is the stuff that maybe he's behind that you can't see unless you're in the profile. But he doesn't say that, does he? I'll say he doesn't say that, but I, I, I would hazard to say it's a reasonable inference that if he's asking for permission to, to search and seize this information, it's because he does not currently have access to it. And so, you know, Clayton is essentially content that he needed direct, he didn't need direct, according to this court's president, he didn't need direct evidence or personal knowledge that there was in fact relevant evidence in the Chanel Facebook page. According to this court's president, he could demonstrate that nexus through reasonable inference and professional experience. And he has both here that this the issuing judge had a substantial basis, and again, this court does not sit in the shoes of the reviewing and issuing judge. The issuing judge did have a substantial basis for issuing the Facebook warrant, and the district court should be affirmed. Thank you. Thank you. Lisa, Lisa, so how much, does she have any time? Well, I am going to give you time. But has she used up her time before? Okay. Three and a half minutes. She's, okay. Well, because I have no idea how long I live, you get three and a half minutes. Thank you. Owing to my ineptness. I want to start with the Chinook warrant, because opposing counsel talked a lot about potential crimes, working on inference, and I think Judge Federico zeroed in on the big problem. So what's the crime? And Judge Phillips, what's the crime at issue? Why do we think we're going to find evidence in the Facebook messages of the Chinook Center? There's no connection here. It's not like they were holding ticket sales and you had to get a ticket from them to attend this protest. There's no reason to believe that anyone even present would have necessarily gotten information from Chinook or would have messaged them, such that there would be evidence that would support this amorphous- Well, you know, this is not proof beyond a reasonable doubt. It's probable cause. There's 60 masked protesters, according to the affidavit. They, and we know, the officer knows that, Officer Steckler, that Chinook is involved. And so he goes to the social media that he knows that they use to get the events chats. And why is that not a reasonable inference that to identify these 60 masked individuals that are obstructing traffic, according to Steckler's affidavit, that this is a reasonable way to identify those 60 individuals? It's not reasonable whatsoever. For one, the fact that protesters were masked comes from Ms. Armandira's warrant and affidavit. It's not contained within the Chinook- Okay, let's say they're not masked. So he knows that there's 60 people, but Officer Steckler's affidavit, I think it would be a stretch to say he knows who those 60 people are. But he also doesn't give any reason to think that, one, they're trying to identify those 60 people, or two, that there's a reason to believe that they would have messaged with the Chinook Center. Ultimately, what you have here is that any organization, if they post an event on their Facebook page, I'm in a neighborhood moms group, they post lots of protests and events on the Facebook page. And then someone engages in some illegal conduct, and now you can search their messages for a week. If there are 60 people in your neighborhood organization that are obstructing traffic, and when they are diverted by an officer, the leader gives the finger to the officer and diverts or goes a different direction, yeah, I think probably an officer would probably have a pretty argument that there's probable cause to search the social media that your organization uses to identify all of the people that refuse to abide by lawful commands. But what basis would he have to believe that all those people are on Facebook, that all those people are part of this group, that they didn't learn about it from a friend, that there wasn't some other thing? There's just really nothing to tie it to the Chinook Center, to believe that there's something in those messages that we're giving this direction. So it's completely just piling upon hunch upon hunch, people use social media, the officer says organizations like this like to use social media to organize and plan. There's no basis for the time period, it's seven days, and there's no explanation for why those days would yield information that would have a nexus to whatever crimes they're investigating. So we have a huge problem with the Chinook Facebook that really does get to the heart of this case, which is you have an advocacy group that promotes an event, and because someone does something illegal at the event, suddenly their Facebook is open to search. And we have a person who participated in an event because she did something illegal at the event. Now all of her private life is open to search when, as this court has honed in on, that the crime at issue was one that was spontaneous. It couldn't possibly have been planned two months in advance, it couldn't have been planned 20 years in advance, which is what some of these search terms got at. If Ms. Armadiris had views of the police or pigs and farm animals 20 years prior to the incident, those were swept up. And when you look at the search terms, you kind of ask, what was the government looking for? They say police, officer, cop, Jonathan, Sam, Samantha, those were all names of people who led the Chinook organization. Housing, human rights, YT, which was something that was just on Ms. Armadiris' Twitter profile as being against YT supremacy, white supremacy. So they use all of these terms. What do they have to do with the bike drop that occurred here? I'm going to let you, you're now at five minutes and I give you three and a half. So I'll give you about 15, 20 seconds. Okay. I think this case is so important because it shows the nefarious way a ruling affirming the district court would impact both individuals and groups exercising their first amendment rights. If this can't even get out of the gate to get past the motion to dismiss, it means that officers can use their conjecture, their feelings about what protesters do in groups that they may not like and say, they've got phones, they've got social media. We get to search it all because there might be something there. And that's simply not enough under the fourth amendment. So we'd ask that this court reverse.  Thank you very much. Okay. Thank you both for your excellent advocacy. It was far better than my management of your clock, but both sides did an excellent job in your briefing and in your arguments. It will be submitted.